UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

WESTLY GEORGE,

                 Petitioner,

v.

RANDEE REWERTS,

                 Respondent.

_____/

Case No. 2:19-cv-201

Honorable Paul L. Maloney

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Westly George is incarcerated with the Michigan Department of Corrections (MDOC) at the Saginaw Correctional Facility in Freeland, Saginaw County, Michigan. Following an eight-day jury trial in the St. Joseph County Circuit Court, Petitioner was convicted of first-degree murder, in violation of Mich. Comp. Laws § 750.316; carrying a concealed weapon (CCW), in violation of Mich. Comp. Laws § 750.227; felon in possession of a firearm and felon in possession of ammunition, in violation of Mich. Comp. Laws § 750.224f; and felony firearm, in violation of Mich. Comp. Laws § 750.227b. On October 13, 2016, the court sentenced Petitioner as a fourth-offense habitual offender, Mich. Comp. Laws § 769.12, to concurrent prison terms of 4 to 20 years on the CCW and felon-in-possession offenses and life imprisonment on the first-degree murder offense. Those sentences were to be served consecutively to a sentence of 2 years for felony-firearm.

On October 7, 2019, Petitioner filed his initial habeas corpus petition, raising three grounds for relief. (ECF No. 1.) Ultimately, after a stay to allow Petitioner to return to state court to exhaust

certain grounds for relief, Petitioner filed an amended petition raising the following eleven grounds

for relief:

I.    [Petitioner's] Sixth Amendment right to a fair trial was violated when the trial court failed to conduct an evidentiary hearing on juror misconduct to determine whether any of the jurors improperly communicated with anyone during deliberations or whether a tainted juror [who was dismissed during deliberations and replaced with an alternate] had corrupted deliberations.

II.   [Petitioner] did not receive the effective assistance of counsel at trial where counsel failed to request an instruction to support a lesser-included offense of voluntary manslaughter.

III.  The prosecution presented legally insufficient evidence that [Petitioner] committed the convicted offenses[,] thereby denying his right to due process under the federal and Michigan Constitutions, and his convictions should be vacated.

IV.   The trial court abused [its] discretion by allowing the false dying declaration statement into evidence because all the witnesses who said they heard the false statement are inconsistent and were not [given] to the police on scene the date this took place. Also Kim Schultz stated she is certain Eugene said no name of any person.

V.    [Petitioner] was denied a speedy trial under the federal and Michigan Constitutions, as well as by statute. U.S. Const. am. VI; Const. 1963, Art. 1, Section 20, MCL 768.1.

VI.   [Petitioner] was denied his Sixth Amendment right to counsel when the prosecutor used testimony from an incarcerated informant that [Petitioner] allegedly confessed to the crime.

VII.  The prosecutor denied [Petitioner] a fair trial under the United States Constitution when he argued in closing statement to the jury that defense counsel was misleading the jury concerning Officer Mohney's testimony.

VIII. Defense counsel was ineffective for failing to move to suppress evidence obtained from [Petitioner's] person pursuant to a search warrant, because the affidavit submitted in support of the search warrant for his person contained knowingly false statements that were necessary to establish probable cause to issue the warrant.

IX.   [Petitioner] was denied due process because the trial court never acquired subject-matter jurisdiction over [Petitioner] because [Petitioner] never made an appearance on the information or had an attorney to appear on his

2

behalf to enter a plea to the charges against him[, thus] denying [Petitioner] procedural due process of law, and [] the effective assistance of counsel.

X.    Newly discovered evidence establishes that the medical examiner Elizabeth Douglas testified falsely regarding the examination of [the] decedent [when she testified] that "the decedent was shot in the back." New evidence shows that the decedent was shot multiple times in the chest. The prosecution suppressed this evidence.

XI.   The trial court allowed the investigating officer in the case, who also testified for the prosecution[,] take a picture of a sitting juror during the trial just before final instructions and deliberation[, which] denied [Petitioner] due process to a fair trial under the United States Constitution. Amend. [Sixth] and Fourteenth.

(Am. Pet. ECF No. 19, PageID.64–83.)

In an order (ECF No. 25) entered on March 23, 2023, the Court lifted the stay and reopened the case, and directed Respondent to file an answer and the state court record. Respondent filed a response and the state court record on September 19, 2023. (ECF Nos. 28, 29.) Respondent contends that all of Petitioner's claims are meritless.[1] For the following reasons, the Court

---

[1] Respondent also argues that the claims added to Petitioner's amended petition (habeas grounds IV through XI) do not relate back to the initial petition and should be dismissed as untimely, and that habeas grounds IV through XI are procedurally defaulted. (ECF No. 28.) Respondent recognizes, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

**Discussion**

**I.      Factual Allegations and Procedural History**

The Michigan Court of Appeals described the events underlying Petitioner's convictions as follows:

> [Petitioner's] convictions arise from the shooting death of Eugene Jackson in the city of Three Rivers on the night of August 20, 2015. [Petitioner], victim, and all of the lay witnesses were residents of the same community. The victim's mother, Christy Jackson testified that on August 15, 2015, [Petitioner] told her that he was going to kill her son because of an earlier conflict between them. Four days later, [Petitioner] visited the victim's cousin, Darinda Brumfield, and told her he was not planning on attending her party the next day because he did not want any problems with anyone on the day of the party.

> On the day of the party [Petitioner] was seen talking to Jackson at a corner near Darinda's home shortly before witnesses heard gunshots and found Jackson on the ground with gunshot wounds. [Petitioner] was seen by several witnesses contemporaneously running down a nearby alley away from the scene. Jackson told some of the people who came to his aid that [Petitioner] shot him. Witnesses placed Jackson into a car and rushed him to a hospital where he ultimately died from four gunshot wounds.

> [Petitioner] appeared at the home of Herbert Drayton's sister not far from the shooting shortly after the shots were fired and asked Drayton for a ride home. Drayton was someone whom [Petitioner] thought of as an Uncle. [Petitioner] told Drayton that someone had been shooting at him and Jackson. Drayton observed that the Three Rivers Police were coming down the alley and told [Petitioner] that he should go to them if someone was shooting at him. The police apprehended [Petitioner]. [Petitioner] told the police while being transported to jail that another man was the shooter and that he had told [Petitioner] to put a knife in his pocket. After [Petitioner] was taken into custody and interviewed, he told police that shots had come from a vehicle that pulled up to the area while Jackson was arguing with this other individual, but he refused to name this person. [Petitioner] denied that he was involved in the shooting.

> [Petitioner] spoke to his cellmate in the St. Joseph County Jail about his case and told him that he thought he had shot Jackson around three times. [Petitioner] confided to his cellmate that his main concern was the resulting gunpowder residue

4

evidence being used against him so he had washed his hands a few times while in the holding cell prior to transport to the jail. He also told the cellmate that he had given the revolver used to shoot Jackson to someone he called "Uncle."

Several of the victim's relatives testified at trial. Jackson's mother testified that [Petitioner] told her prior to the shooting that he was going to kill her son. His cousin, Samuel Brumfield, testified that he had dropped Jackson off at the corner near his mother's house after Jackson asked him to stop so he could get out of the car after seeing [Petitioner]. Jackson's uncle, Angelo Brown, testified that after he saw [Petitioner] walking down the alley near his house wearing a blue hoodie and blue jeans, shots rang out so he ran outside where he found Jackson lying on the ground. He stated Jackson told him "Uncle, West Coast shot me." Brown knew [Petitioner] to go by the name "West Coast." Other witnesses gave similar testimony, stating that they heard gunshots or what they thought to be firecrackers and observed a man prior to and after the shooting wearing blue jeans and a hoodie walking to and from the alley where the victim was shot. Additionally, forensic evidence was introduced. Samples from [Petitioner's] hands, face, and clothes were analyzed for gunshot residue which was only found on [Petitioner's] sweatshirt and jeans. Steven Howard, an expert in gunsmith and gunshot residue testified that he examined the bullets recovered in this case and determined that they were from a revolver due to the lack of shell casings.

*People v. George*, No. 335651, 2018 WL 3244122, at *1–2 (Mich. Ct. App. July 3, 2018).

Jury selection for Petitioner's trial occurred on August 29, 2016. (Trial Tr. I, ECF No. 29-9.) Over the course of five days, the jury heard testimony from numerous witnesses, including those individuals who were near the scene when the shooting occurred, law enforcement officers, several of Jackson's relatives, Petitioner's cellmate from the St. Joseph County Jail, and defense expert Steven Howard. (Trial Tr. II, III, IV, V, and VI, ECF Nos. 29-10, 29-11, 29-12, 29-13, 29-14.) On September 8, 2016, the jury returned a guilty verdict. (Trial Tr. VIII, ECF No. 29-16, PageID.2575.) Petitioner appeared before the trial court for sentencing on October 13, 2016. (ECF No. 29-17.)

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals. Petitioner raised the following issues in his counseled brief: (1) the trial court erred by not conducting an evidentiary hearing regarding juror misconduct; (2) counsel

was ineffective for failing to request a lesser-included voluntary manslaughter instruction; and (3) the prosecution did not present sufficient evidence to support Petitioner's convictions. (ECF No. 29-20, PageID.2868.) In a *pro per* supplemental brief, Petitioner raised the following issues: (1) the trial court abused its discretion in allowing the dying declaration into evidence; (2) the prosecutor committed misconduct by presenting perjured testimony from Angelo Brown and Walter Nelson concerning the dying declaration; (3) counsel was ineffective for taking a case that she could not handle without associating with an attorney who was competent to handle a first-degree murder trial; and (4) the trial court erred by limiting Petitioner's expert witness's testimony and not allowing his data to be entered into evidence. (*Id.*, PageID.2808.) In an opinion entered on July 3, 2018, the court of appeals affirmed Petitioner's convictions and sentences. *George*, 2018 WL 3244122, at *1. The Michigan Supreme Court denied Petitioner's application for leave to appeal on February 4, 2019. *See People v. George*, 922 N.W.2d 351 (Mich. 2019).

As noted *supra*, Petitioner filed his initial § 2254 petition in this Court on October 7, 2019. (ECF No. 1.) On December 31, 2019, the Court ordered Respondent to file an answer to the petition. (ECF No. 4.) Before Respondent's answer was due, Petitioner filed a motion to stay these proceedings to permit him to exhaust state court remedies with respect to additional habeas grounds. (ECF No. 7.) Petitioner identified three additional issues he intended to exhaust: prosecutorial misconduct during closing arguments; a due process violation when the trial judge permitted the courtroom deputy to take a picture of a juror during trial; and denial of a speedy trial. (Pet'r's Mot., ECF No. 7, PageID.15.) The Court granted Petitioner's requested stay but, as provided in *Palmer v. Carlton*, 276 F.3d 777, 781 (6th Cir. 2002), the Court required Petitioner to file his motion for relief from judgment pursuant to Michigan Court Rule 6.500 within 30 days of

6

the stay order and further required Petitioner to return to the Court to file an amended petition including his newly exhausted claims within 30 days of the Michigan Supreme Court's decision denying relief on Petitioner's appeal. (ECF No. 11, PageID.34.)

Petitioner asked the Court for an extension of the initial 30-day period to permit him to add an additional issue based on new evidence showing that the prosecutor committed misconduct when he argued that the victim was shot in the back when, in fact, the victim was shot in the chest. (Pet'r's Mot. for Extension, ECF No. 12, PageID.36.) The Court concluded that the "new evidence" did not warrant an extension; however, because the deadline had passed in the interim, the Court allowed Petitioner 15 days from the date of the order to file his motion for relief from judgment. (ECF No. 13, PageID.40.)

Petitioner subsequently filed a second motion for an extension of time to file a motion for relief from judgment. (ECF No. 14.) In an order (ECF No. 16) entered on May 4, 2021, the Court granted Petitioner that relief. Meanwhile, Petitioner filed his Rule 6.500 motion on or about October 14, 2020. (ECF No. 29-18.) Petitioner expanded the scope of his motion for relief from judgment beyond the issues he had identified for this Court. (Pet'r's Brief in Support of Mot. for Relief from J., ECF No. 19-1, PageID.99–102.) He added an issue regarding the prosecutor's allegedly improper use of testimony from a "jailhouse informant." He added an issue regarding defense counsel's ineffective assistance for failing to object to the affidavit submitted in support of the search warrant. He added a due process claim regarding the trial court's lack of jurisdiction, and he added an issue regarding the prosecutor's suppression of the victim's death certificate.

In an order entered on April 13, 2021, the trial court denied Petitioner's Rule 6.500 motion. (ECF No. 29-19.) The court of appeals and supreme court denied Petitioner's applications for leave

to appeal on September 30, 2021, and April 5, 2022, respectively. (ECF Nos. 29-21, PageID.2980; 29-23, PageID.3242.) By letter dated May 30, 2022, 55 days after the Michigan Supreme Court denied leave to appeal, Petitioner asked the Court what he should do next. (ECF No. 17.) Without then addressing the tardiness of Petitioner's return to this Court, the Court directed the Clerk to send Petitioner a copy of the form petition and advised Petitioner to file an amended petition along with a motion to amend. (ECF No. 18.) Petitioner filed his amended § 2254 petition—without a motion seeking leave to amend—49 days later. (ECF No. 19.)

## II.   AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in

their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d

at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III. Discussion

### A. Ground III—Sufficiency of the Evidence

As his third ground for relief, Petitioner contends that the prosecution presented insufficient evidence to support the jury's verdict, therefore violating Petitioner's due process rights. (Am. Pet., ECF No. 19, PageID.81.) The court of appeals rejected Petitioner's argument, first applying the following standard for reviewing Petitioner's claim:

> In reviewing a claim of insufficient evidence, this Court reviews the evidence de novo in the light most favorable to the prosecution; the test being whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v. Wolfe*, 440 Mich. 508, 515; 489 N.W.2d 748 amended on other grounds 441 Mich. 1201 (1992); *People v. Hutner*, 209 Mich. App. 280, 282; 530 N.W.2d 174 (1995).

*George*, 2018 WL 3244122, at *3. Although the court of appeals cited state authority, the standard applied is identical to the constitutional "sufficiency of the evidence" standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires the court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly

be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams v. Taylor*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard—here *Jackson* rather than *Strickland*—Petitioner can only overcome the deference afforded state court decisions if the determination of regarding Petitioner's sufficiency of the evidence challenge is an unreasonable application of *Jackson* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only

examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Here, the court of appeals followed *Jackson*'s command. The court of appeals first set forth the elements required to prove first-degree murder. *See George*, 2018 WL 3244122, at *3. The court of appeals then considered the evidence in a light that favored the prosecution:

> The strongest evidence of premeditation in this case came from statements attributed to [Petitioner] himself. Five days before the shooting, [Petitioner] told the victim's mother he was going to kill her son. Despite her comments to [Petitioner] that everyone would "lose" should [Petitioner] go through with his plan to kill her son, [Petitioner] reiterated his intent to kill the victim by telling her "All right, well, you [sic] walk around with that rest in peace G Baby tee shirt and then you gonna know I wasn't playin." Additionally, two other witnesses also testified that [Petitioner] made comments on the night before the shooting that he was not going to be attending Darinda's party the next day because he didn't want any trouble with anybody at the party.

> Based on the testimony given by Ms. Jackson and the two other witnesses regarding [Petitioner's] comments, a jury could have reasonably inferred that [Petitioner's] contemplated the murder for several days prior to the shooting. Thus contrary to [Petitioner's] argument, the jury's reasonable inference that [Petitioner's] actions were premeditated was supported by evidence on the record.

> [Petitioner] also asserts that because there were no witnesses to the shooting there was no direct evidence presented to show that [Petitioner] was the shooter and the

13

evidence proving his identity as the shooter was merely circumstantial. He misapprehends the law. "Circumstantial evidence and reasonable inferences arising therefrom can sufficiently establish the elements of a crime." *People v. Schultz,* 246 Mich. App. 695, 702; 635 N.W.2d 491 (2001). There was significant testimony placing [Petitioner] near the alley where the victim was found prior to and after the shooting. The deceased named him as his murderer. Numerous witnesses also testified to seeing [Petitioner] fleeing the area wearing a blue sweatshirt or hoodie carrying a gun. [Petitioner] was arrested in the area wearing a blue sweatshirt. The hooded sweatshirt later tested positive for gunshot residue. Additionally, while being held in the St. Joseph County Jail, [Petitioner] told his cell mate that he killed Jackson, using a revolver to shoot him around three times.

Viewing the evidence and reasonable inferences in the light most favorable to the prosecution, there was sufficient evidence to convince a jury beyond a reasonable doubt that [Petitioner] committed first-degree premeditated murder.

*George*, 2018 WL 3244122, at *3.

In his § 2254 petition, Petitioner essentially relies upon the arguments that he raised in—and that were rejected by—the court of appeals. To prevail on his sufficiency claim now, Petitioner must show that the inferences urged by the appellate court are unreasonable. Notably, "[t]he facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016). Petitioner can overcome that presumption with clear and convincing evidence; he has not. He does not offer any evidence to show that the court of appeals' factual determinations are unreasonable on the record.

In *Coleman v. Johnson*, 566 U.S. 650, 655 (2012), the Supreme Court provided some guidance with respect to the distinction between a reasonable inference and mere speculation. Based on the Court's analysis, a reasonable inference is an inference that a rational factfinder could make from the facts. That is hardly an earth-shattering revelation, and it is not a particularly onerous burden. The Court went so far as to say, "the only question under *Jackson* is whether [a] finding is so insupportable as to fall below the threshold of bare rationality." *Id.* at 656.

Petitioner has offered nothing from which this Court could conclude that the court of appeals' inferences were irrational. Certainly, one could interpret the underlying events differently and reach the opposite conclusions, but that does not render the court of appeals' conclusions and inferences irrational. Petitioner, therefore, has failed to meet his burden.

Moreover, Petitioner essentially invites this Court to reweigh the witnesses' credibility and resolve all conflicts and make all inferences in his favor. Under *Jackson*, a habeas court is not required to sift through the evidence and place it on one side of the scale or the other for the purpose of assessing whether the jurors' estimation of the balance is correct. Instead, the Court is only required to look at the evidence in a light that favors the prosecution and assess whether a rational factfinder could conclude that Petitioner is guilty beyond a reasonable doubt considering that evidence. It is up to the jury to decide issues of credibility, to decide between conflicting accounts, and draw inferences—so long as the inferences are reasonable. *See Herrera*, 506 U.S. at 401–02; *Martin*, 280 F.3d at 618. Petitioner's invitation turns the *Jackson* standard on its head.

In sum, Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support Petitioner's first-degree murder conviction is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief on habeas ground III.

**B.      Ground V—Speedy Trial Violation**

As his fifth ground for relief, Petitioner asserts that his speedy trial rights under the federal and state constitutions, as well as under state law, were violated. (Am. Pet., ECF No. 19, PageID.65.) Petitioner was arrested on August 20, 2015, and his trial began on August 29, 2016. (ECF No. 29-19.)

In *Brown v. Romanowski*, 845 F.3d 703 (6th Cir. 2017), the Sixth Circuit Court of Appeals reviewed the clearly established federal law with respect to the constitutional requirement for a speedy trial:

> The Sixth Amendment guarantees in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. These rights apply to the states through the Fourteenth Amendment. *Klopfler v. North Carolina*, 386 U.S. 213, 223 (1967). The purpose of the speedy-trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished. *Doggett v. United States*, 505 U.S. 647, 654 (1992); *United States v. Loud Hawk*, 474 U.S. 302, 312 (1986); *United States v. MacDonald*, 456 U.S. 1, 7–8 (1982); *Barker v. Wingo*, 407 U.S. 514, 532–33 (1972); *United States v. Marion*, 404 U.S. 307, 320 (1971); *United States v. Ewell*, 383 U.S. 116, 120 (1966). The sole remedy for a violation of the speedy-trial right is dismissal of the charges. *See Strunk v. United States*, 412 U.S. 434, 439–40 (1973); *United States v. Brown*, 169 F.3d 344, 348 (6th Cir. 1999).
>
> In *Barker*, the Supreme Court established a four-factor test for determining whether a defendant has been denied the constitutionally guaranteed right to a speedy trial. *Barker* held that a court must consider (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. No one factor is dispositive. Rather, they are related factors that must be considered together with any other relevant circumstances. *Id.* at 533.

*Brown*, 845 F.3d at 712. The *Barker* Court acknowledged that its test was a flexible balancing test and, thus, "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." *Barker*, 407 U.S. at 529–530. The flexibility of the test has significant implications for this Court's review under the AEDPA standard. "'The more general the rule at issue'—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" *Renico v. Lett*, 559 U.S. 766, 776 (2010) (quoting *Yarborough*, 541 U.S. at 664).

In the Michigan state courts, the right to a speedy trial is guaranteed by the United States constitution, U.S. Const. amend VI; the Michigan constitution, Mich. Const. 1963 art.1, § 20; state

16

statute, Mich. Comp. Laws § 768.1; and court rule, Mich. Ct. R. 6.004(D). *People v. Cain*, 605 N.W.2d 28, 39 (Mich. Ct. App. 1999); *People v. McLaughlin*, 672 N.W.2d 860, 867 (Mich. Ct. App. 2003). The Michigan state courts apply the *Barker* four-factor test "to determine if a pretrial delay violated a defendant's right to a speedy trial[,]" whether the speedy trial right at issue arises from federal or state law. *Cain*, 605 N.W.2d at 39 (citing *People v. Collins*, 202 N.W.2d 769 (Mich. 1972)).[2]

To the extent that the state constitutional, statutory, and rule guarantees relating to a speedy trial require anything more than clearly established federal law requires, those additional requirements are purely matters of state law. Petitioner's challenges to the trial court's determinations with regard to state law are not cognizable on habeas review. *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991) (stating "it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions.").

Petitioner raised his speedy trial claim in his Rule 6.500 motion, and the trial court rejected it. The trial court first set forth the following relevant procedural history:

> [Petitioner] was arrested on August 20, 2015. Preliminary exam was held on September 8, 2015. The information was filed on September 9, 2015. There was no arraignment as the Court has adopted a local administrative order that eliminated arraignment for a defendant represented by an attorney and he was given a copy of the information pursuant to MCR 8.112(B). Various status conferences occurred during which the evidence and need for further testing was addressed and then the

---

[2] Although the state courts apply the clearly established federal law, the *Barker* test, to evaluate "speedy trial" claims, they apply it a little differently than the federal courts. The state courts shift the burden of proof with respect to prejudice based on the length of the delay, drawing the line at 18 months. *Cain*, 238 Mich. App. at 112. The federal courts, however, eschew such a "bright-line rule." *Brown*, 845 F.3d at 717. Instead, the federal "courts must conduct a functional analysis of the right in the particular context of the case." *Id.* (internal quotation marks omitted) (quoting *United States v. Ferreira*, 665 F.3d 701, 709 (6th Cir. 2011)); *see Barker*, 407 U.S. at 522. This is a difference between the federal and state applications of the test, but the difference does not render the state court's application unreasonable or contrary to *Barker*. *See, e.g.*, *Brown v. Bobby*, 656 F.3d 325, 329–330 (6th Cir. 2011) (concluding that Ohio's use of a 270-day rule was not "contrary to" *Barker*).

appointment of an expert for the defense was granted. The adjournments [were] at the request of the defense or with their approval for the most part. [Petitioner] was warned that these adjournments would not count towards the 180 [day] rule as set out in MCR 6.004(C). The parties stipulated to move the final status conference to August 10, 2016 and the trial began on August 29, 2016.

(ECF No. 29-19, PageID.2763.)

The trial court then set out the relevant law, noting that the Michigan Supreme Court had

adopted the four-part test set forth in *Barker*. (*Id.*, PageID.2763–2764.) The court then discussed

those four factors as follows:

Length of the Delay[.] "Although not determinative of a speedy trial claim, length of a delay is a factor that triggers an investigation of the speedy trial issue." Where there has been a delay of at least six months after a defendant's arrest, further investigation into a claim of denial of the right to a speedy trial is necessary. For a delay of 18 months or more, prejudice to the defendant is presumed and the burden shifts to the prosecution to rebut the presumption. Where the delay following a defendant's arrest is less than 18 months, the defendant bears the burden of showing prejudice by reason of the delay.

Reasons for the Delay. Regarding the second prong—reasons for delay—the court balances the conduct of both the prosecution and the defendant. "The reasons for delay are examined by [the court] and each period of delay is assigned to either the prosecutor or the defendant. Ordinarily, "delays caused by defense counsel are properly attributed to the defendant, even where counsel is assigned[,]" because "assigned counsel generally are not state actors for purposes of a speedy-trial claim." However, it is possible that an assigned counsel's delay could be charged to the state if a breakdown in a state's public defender system caused the delay. "[I]f the defendant has not contributed to the delay, a period of otherwise unexplained inaction in excess of 180 days in the prosecution of a charge pending against an inmate is per se a violation of the statute, unless the people make an affirmative showing of exceptional and unavoidable circumstances which hamper the normally efficient functioning of the trial courts." "Where a delay is unexplained, it is charged to the prosecution." "Although delays inherent in the court system, e.g., docket congestion, 'are technically attributable to the prosecution, there are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." Delays occasioned by the prosecution's successful pursuit of an interlocutory appeal are "taken out of the calculation," and therefore, are not attributable to either party when determining whether a defendant's right to a speedy trial has been violated.

Assertion of the Right[.] A defendant's assertion of his or her right to a speedy trial is the third factor the court must consider in determining whether the right to a speedy trial has been violated. While failure to assert the right to a speedy trial does

not automatically constitute a waiver of the right, it is strong evidentiary support for the conclusion that the defendant's right was not violated. In *People v. Missouri*, 100 Mich. App. 310, 322 (1980), the Court of Appeals concluded that the defendants' assertion of the right to a speedy trial two weeks before trial and nearly 30 months after indictment was strong evidence that the delay had not caused a serious deprivation of their right to a speedy trial.

Resulting Prejudice[.] The final inquiry into a claim of a speedy trial violation is whether the defendant experienced any prejudice as a result of the delay. There are two types of prejudice a defendant may experience: (1) prejudice to his or her person; and (2) prejudice to his or her defense. "Prejudice to his [or her] person would take the form of oppressive pretrial incarceration leading to anxiety and concern." "Prejudice to his [or her] defense might include key witnesses being unavailable." "Impairment of defense is the most serious, 'because the inability of a defendant to adequately prepare his [or her] case skews the fairness of the entire system.'" General allegations of possible prejudice (e.g., witness[es'] memories fade, financial burden) are insufficient. Rather, a defendant must "specifically argue[] howe the delay caused him [or her] prejudice."

Here [Petitioner] did assert his request for a speedy trial but then agreed to the need for further delays in order for his defense to prepare for trial and to obtain experts. He does not meet the burden of showing how his defense was prejudiced by a delay in the trial that he stipulated to on several occasions. The murder occurred on August 20, 2015 and the trial began August 29, 2016. All of the delays were understandable, and no prejudice has been shown that would have affected the outcome.

(*Id.*, PageID.2764–2765 (internal citations omitted).)

Because the trial court applied the four-factor *Barker* test, there is no question that the court applied a standard that is not contrary to clearly established federal law. To prevail, Petitioner must show that the court applied that standard unreasonably. He has not made that showing.

Here, Petitioner's trial began a little more than one year after his arrest. "A delay approaching one year is presumptively prejudicial and triggers application of the remaining three factors." *Maples v. Stegall*, 427 F.3d 1020, 1026 (6th Cir. 2005) (citing *Doggett*, 505 U.S. at 652 n.1). However, the critical element is prejudice to the defendant.[3] Certainly, the trial court's

---

[3] The *Barker* Court identified three specific categories of harm that might accrue to a pretrial detainee because of undue delay in proceeding with trial: "(i) . . . oppressive pretrial incarceration;

conclusion that Petitioner failed to demonstrate that his defense was prejudiced is not unreasonable.

In sum, Petitioner fails to identify any flaw in the trial court's rejection of his speedy trial claim beyond the fact that he disagrees with the result. Because Petitioner has failed to show that the state court's decision is an unreasonable application of *Barker*, he is not entitled to relief with respect to habeas ground V.

### C.    Grounds Asserting Trial Court Error

#### 1.    Ground I—Juror Misconduct

In his first ground for relief, Petitioner argues that the trial court denied him a fair trial by "fail[ing] to conduct an evidentiary hearing on juror misconduct to determine whether any of the jurors improperly communicated with anyone during deliberations or whether a tainted juror had committed misconduct." (Am. Pet., ECF No. 19, PageID.64.)

The record reflects that prior to final jury instructions being given, the parties asked to speak to the trial judge because a reporter had overheard one of the jurors talking about the case at a local coffee shop. (Trial Tr. VII, ECF No. 29-15, PageID.2412.) The trial judge conducted a hearing regarding the matter in chambers. The reporter indicated that he had heard the juror in question "discussing gunshot residue, and, specifically, the—the Lava soap that—that was discussed yesterday by the expert." (*Id.*, PageID.2413.) The reporter noted that such information was not "in [a] report, so [he did not] think she got it from the media." (*Id.*) The reporter said that he saw the juror walk into the courtroom and he went, "Crap, I got to say something." (*Id.*, PageID.2414.)

---

(ii) . . . anxiety and concern of the accused; and (iii) . . . the defense [could] be impaired." *Barker*, 407 U.S. at 532 (footnote omitted).

After the juror at issue was identified, she was brought back to the trial judge's chambers. (*Id.*, PageID.2423.) The trial judge asked the juror if she had been at the coffee shop in question that morning, and the juror responded that she had been. (*Id.*) The juror said that the individual she had a conversation with asked her "what [she] was doing and [the juror] said [she] was on jury duty." (*Id.*) The juror denied that they had talked about the facts of the case. (*Id.*, PageID.2424.)

After the juror was excused from chambers, the court asked counsel about their feelings regarding the issue. (*Id.*, PageID.2426.) The prosecutor noted that it was concerning, and that he did not think that "the reporter would have any reason to make something up." (*Id.*) Petitioner's attorney did not think that what the juror allegedly said, according to the reporter, was "so damaging to either side." (*Id.*, PageID.2428.) At that time, the parties did not request that the juror be excused.

After proceedings resumed in the courtroom, the trial judge informed the juror that the parties and the court had held a conversation with one of the jurors, and that the juror "confirmed or indicated that she only let a person know that she was on jury duty and that she couldn't discuss it any further than that and that no information was divulge—was disclosed and that she didn't get any information from anyone else that will interfere with her ability to be a juror." (*Id.*, PageID.2429.) Counsel then gave closing arguments, the court instructed the jury, and the jury began deliberations.

The next day, the court indicated that another issue regarding the juror who had been questioned the previous day had come up. (Trial Tr. VIII, ECF No. 29-16, PageID.2545.) The court indicated that the owner of the coffee shop had called the court "indicating that she overheard your conversation, that she had confirmed it with others that you actually talked about the facts of the case, you talked about the GSR, you talked about Lava soap, and that you already indicated

21

that you had your mind made up before you even began to hear instructions or final arguments." (*Id.*) The juror denied that the conversation went that way and suggested that the owner was "making all that up." (*Id.*, PageID.2546.) The court then asked counsel to see him in chambers. (*Id.*)

After the court went back on the record, the court indicated that while in chambers, he and counsel had called the owner of the coffee shop, who reiterated what she heard. (*Id.*, PageID.2547.) Specifically, the owner told the court that "she overheard the conversation between a lady that she knows as 'Jen' with short hair and glasses talking to another lady, talking about Lava soap, talking about GSR, and talking about the fact that she already knew what she was going to say when she went in." (*Id.*) The court noted that although the juror was denying that conversation, there were now two witnesses stating that they heard "discussion about specifics of the case. There's no other person that would have heard about the Lava soap and the GSR, because it wasn't in the newspaper or in the news accounts." (*Id.*) The court noted that to "ensure the integrity" of trial, the juror would be excused, and deliberations would start again with a new juror. (*Id.*)

The court then called the jury in and informed them that the juror had been excused. (*Id.*, PageID.2551.) The court told the jury that the juror had been excused because she had been overheard discussing the case in public. (*Id.*)

Subsequently, Petitioner's counsel made a motion for a mistrial based on juror misconduct. (*Id.*, PageID.2559.) The prosecutor stated that he was "appalled" by the juror's conduct, noting that he thought the juror had "lied to the Court on two separate occasions." (*Id.*) He did not believe that it amounted to a mistrial because alternate jurors were available. (*Id.*, PageID.2560.) The court denied the motion for a mistrial, noting that it did not appear that the juror "had conversations with anyone that brought information in," and that she did not bring anything extraneous into the jury

room. (*Id.*, PageID.2561.) The court noted that it would confirm that with the jurors once empaneled again. (*Id.*)

After the full jury was assembled, the court instructed them to "start as if it was day one, as the first minute in there. . . . Whatever happened before is null and void." (*Id.*, PageID.2566.) The court asked the juror if the excused juror had brought any outside information into the jury room. (*Id.*, PageID.2567.) Two jurors responded that they did not believe she had. (*Id.*) The court then excused the jury to begin deliberations at 11:12 a.m. (*Id.*) The jury indicated that it had reached a verdict around 3:11 p.m. (*Id.*, PageID.2574.)

A criminal defendant is constitutionally entitled to a trial "by an impartial jury." *See* U.S. Const. amend. VI; *see also Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (noting that the "right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors"). This guarantee reflects the requirement that a jury arrive at a verdict solely "based upon the evidence developed at the trial." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (quoting *Irvin*, 366 U.S. at 722).

Due process, however, "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 2017 (1982). "When a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury." *Ewing v. Horton*, 914 F.3d 1027, 1030 (6th Cir. 2019) (quoting *Nevers v. Killinger*, 169 F.3d 352, 373 (6th Cir. 1999), *abrogated on other grounds by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000)).

The Supreme Court has "long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith*, 455 U.S. at 215.

Such a hearing, referred to as a *Remmer*[4] hearing, must be held once a defendant raises a "colorable claim of extraneous influence." *See United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005). To assert a colorable claim, a defendant "must do more than simply raise the possibility of bias." *Id.*

Petitioner raised this claim on direct appeal, and the court of appeals rejected it. The court of appeals first noted that denial of a motion for mistrial based on juror misconduct is reviewed for an abuse of discretion, and that a new trial is not warranted unless substantial harm was caused to the defendant. *See George*, 2018 WL 3244122, at *2. The court of appeals then stated:

> First, there is little evidence that the juror herself was exposed to any extraneous influences and therefore had no extraneous information to share with the jury as a whole. The court was informed that the juror was heard discussing the case at a local restaurant by a reporter and through a phone call from the restaurant owner. Although the juror was overheard talking about the case at a local restaurant by both informants, neither witness indicated that they observed anyone else talking to the juror about the facts of the case, responding to the juror, or offering her any verbal input. Without evidence of outside influence upon the excused juror there could be no extraneous influence on the jury due to the juror's misconduct.
>
> [Petitioner] further argues that the trial court should have conducted an evidentiary hearing to determine whether the jury had been subjected to any outside influences due to the juror's misconduct. The court asked the entire jury whether the dismissed juror had brought any information in from outside the jury room and two jurors verbally replied "no." The court reasonably relied on the affirmative denial of the two and the silence of the other ten to reasonably conclude that the jurors were not subjected to any improper outside influences from the excused juror. Thus there was no need for the additional step of an evidentiary hearing once the court determined from the other jurors that the excused juror did not bring in any extraneous influences.
>
> [Petitioner] has also not demonstrated that there was a substantial possibility that the jury's verdict was affected. *People v. Budzyn*, 456 Mich. 77, 89; 566 N.W.2d 229 (1997). "[J]urors are presumed to be impartial until the contrary is shown." *People v. Miller*, 482 Mich. 540, 550; 759 N.W.2d 850 (2008). Once the trial court was notified a second time about the juror's misconduct the court interrupted the jury deliberations and promptly dismissed her and replaced her with an alternate instructing the jury that they were to start deliberations anew. It is well settled that jurors are presumed to follow the trial court's instructions. *People v. Petri*, 279 Mich. App. 407, 414; 760 N.W.2d 882 (2008). Therefore it is reasonable to presume that the verdict that the jury returned was not based on any of the discussions that

---

[4] *Remmer v. United States*, 347 U.S. 227 (1954).

the jury had during the 3½ hours of deliberations that occurred when the dismissed juror was still on the jury panel. [Petitioner] has also not provided any evidence to overcome this presumption.

*George*, 2018 WL 3244122, at \*2.

A state court's findings regarding juror partiality are questions of fact that are presumptively correct under 28 U.S.C. § 2254(d). *See Smith*, 455 U.S. at 218 (citing *Sumner v. Mata*, 449 U.S. 539, 551 (1981)). Petitioner offers no evidence, much less clear and convincing evidence, to overcome this presumption. As the court of appeals noted, two of the jurors indicated verbally that the excused juror had not brought any extraneous influences into the jury room before she was dismissed. As set forth *supra*, a trial court is required to hold a *Remmer* hearing regarding juror partiality only after a defendant raises a "colorable claim of extraneous influence" that does more than "simply raise the possibility of bias." *See Owens*, 426 F.3d at 805. Petitioner did not raise a colorable claim of extraneous influence before the trial court—he did not present any evidence to suggest that a non-juror had influenced the juror who was ultimately dismissed, and that the juror tainted the rest of the jury with such influence. Moreover, as the court of appeals noted, the jury was instructed to begin deliberations anew with the alternate juror, and a jury is presumed to follow its instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Petitioner has offered no evidence to suggest that the jury's verdict was based on anything other than the discussions the jury had during the hours of deliberation that occurred after one juror was dismissed and replaced with the alternate juror.

In sum, Petitioner has not demonstrated that the court of appeals' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief with respect to habeas ground I.

## 2.    Ground IV—Admission of Dying Declaration

As his fourth ground for relief, Petitioner contends that the trial court abused its discretion by allowing the "false dying declaration" into evidence "because all the witnesses who said they heard the false statement are inconsistent, and were not giv[en] to the police on scene the date this took place." (Am. Pet., ECF No. 19, PageID.83.) Petitioner also asserts that "Kim Schultz stated she is certain Eugene said no name of any person." (*Id.*)

Petitioner raised this claim on direct appeal in his *pro per* supplemental brief. The court of appeals rejected it, noting that the victim's dying declaration was admitted pursuant to the hearsay exception set forth in Rule 804(b)(2) of the Michigan Rules of Evidence. *See George*, 2018 WL 3244122, at *5. The court of appeals concluded that the victim's dying declaration met the exception, stating:

> The victim made statements to various friends and family members representing that he had been shot by [Petitioner] and indicating that he needed to get to a hospital and did not want to die. Hence there was evidence that the victim believed his death to be impending. He ultimately succumbed to his wounds and was, therefore unavailable to testify. Accordingly, the trial court properly admitted the victim's statements as dying declarations under MRE 804(b)(2). The fact that the recitations of what the victim said are inconsistent does not negate the fact that the victim's statements meet the threshold requirements to be admitted as dying declarations. Furthermore, [Petitioner's] arguments regarding inconsistency go to weight to be given the testimony, not their admissibility. *People v. Hintz*, 62 Mich. App. 196, 203; 232 N.W.2d 228 (1975).

*George*, 2018 WL 3244122, at *5.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." 502 U.S. at 67–68. The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78,

26

84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Thus, the court of appeals' conclusion that the trial court properly admitted the victim's dying declaration under MRE 804(b)(2) is axiomatically correct.

It is possible that an evidentiary ruling—even a ruling that is axiomatically correct under state law—still violates due process. State-court evidentiary rulings can rise to the level of due process violations if they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation marks omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "a Supreme Court case establishing a due process right with regard to the specific kind of evidence at issue"). Petitioner, however, has not met this difficult standard.

Petitioner's challenge to the admission of the dying declaration does raise the specter of a violation of the Confrontation Clause. The Confrontation Clause of the Sixth Amendment gives

the accused the right "to be confronted with the witnesses against him." U.S. Const. amend VI; *Pointer v. Texas*, 380 U.S. 400, 403–05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause, therefore, prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Clearly, the victim was unavailable to testify, and Petitioner had no prior opportunity to cross-examine the victim. However, Petitioner cannot demonstrate that the admission of the victim's dying declaration violated clearly established federal law. In *Crawford*, the Supreme Court noted, in dicta, that "[a]lthough many dying declarations may not be testimonial, there is authority for admitting even those that clearly are . . . . We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations." *Id.* at 56 n.6. Four years later, the Supreme Court recognized dying declarations as one of "two forms of testimonial statements . . . admitted at common law even though they were unconfronted") *Giles v. California*, 554 U.S. 353, 358 (2008). Indeed, in 2011, the Court reiterated its suggestions regarding dying declarations set forth in *Giles* and *Crawford*. *See Michigan v. Bryant*, 562 U.S. 344, 351 n.1 (2011). In any event, the Supreme Court has never held that dying declarations are inadmissible as violative of the Sixth Amendment's Confrontation Clause. *See Williams*, 529 U.S. at 412 (explaining that the phrase "clearly established Federal law, as determined by the Supreme Court of the United States," as used in § 2254(d)(1), "refers to the holdings, as opposed to the dicta," of Supreme Court decisions).

Given the lack of Supreme Court precedent regarding whether admission of dying declarations violates the Confrontation Clause, the state courts' rejection of this claim cannot have been contrary to, or an unreasonable application of, clearly established federal law. *See Carey v. Musladin*, 549 U.S. 70, 76 (2006) ("Given the lack of holdings from this Court [on the issue at hand], it cannot be said that the state court 'unreasonably applied clearly established Federal law.'"). Petitioner, therefore, is not entitled to relief on habeas ground IV.

### 3.      Ground IX—Subject-Matter Jurisdiction

As his ninth ground for relief, Petitioner asserts that he was denied due process because the trial court never acquired subject-matter jurisdiction over him. (Am. Pet., ECF No. 19, PageID.73.) According to Petitioner, the trial court never acquired jurisdiction because Petitioner "never made an appearance on the information, or had an attorney to appear on his behalf to enter a plea to the charges against him." (*Id.*) Petitioner also contends that this amounted to ineffective assistance of counsel. (*Id.*) The Court considers underlying due process claim below and will consider his related ineffective assistance claim *infra* in Part E.4.

Petitioner raised this claim in his Rule 6.500 motion and the trial court rejected it. First, as part of Petitioner's speedy trial claim, the trial court noted that it "has adopted a local administrative order [(LAO)] that eliminated arraignment for a defendant represented by an attorney and he was given a copy of the information pursuant to MCR 8.112(B)." (ECF No. 29-19, PageID.2763.) The trial court summarily dismissed Petitioner's subject-matter jurisdiction challenge, stating: "As stated earlier this court does not hold an arraignment after the bindover pursuant to its LAO approved by the Supreme Court and allowed under the Court Rules. The information is filed immediately as reflected in transcripts." (*Id.*)

The determination of whether a particular state court is vested with jurisdiction under state law and is the proper venue to hear a criminal case is a "function of the state courts, not the federal

29

judiciary." *Wills v. Egeler*, 532 F.2d 1058, 1059 (6th Cir. 1976). Moreover, "a state court's interpretation of state jurisdictional issues conclusively establishes jurisdiction for purposes of federal habeas review." *Strunk v. Martin*, 27 F. App'x 473, 475 (6th Cir. 2001).

The Michigan Supreme Court has described the concept of subject matter jurisdiction as follows: "Subject matter jurisdiction concerns a court's abstract power to try a case of the kind or character of the one pending and is not dependent on the particular facts of the case." *People v. Lown*, 794 N.W.2d 9, 23 (Mich. 2011) (internal quotation marks and emphasis omitted). "Michigan circuit courts are court of general jurisdiction and unquestionably have jurisdiction over felony cases." *Id.*; *see also* Mich. Const. of 1963, art. 6, §§ 1 & 13; Mich. Comp. Laws §§ 600.151, 600.601, and 767.1. Any purported violation of these state jurisdictional laws does not provide a basis for federal habeas relief. *See Estelle*, 502 U.S. at 67–68.

Moreover, to the extent Petitioner takes issue with the fact that he was not arraigned on the information, thereby violating due process, the Supreme Court has long held that due process "does not require the state to adopt any particular form of procedure, so long as it appears that the accused has had sufficient notice of the accusation and an adequate opportunity to defend himself." *Garland v. Washington*, 232 U.S. 642, 645 (1914). Thus, under this test, "it cannot for a moment be maintained that the want of formal arraignment deprived the accused of any substantial right, or in any wise changed the course of trial to his disadvantage." *Id.*

Here, Petitioner offers no basis to challenge the St. Joseph County Circuit Court's subject matter jurisdiction over his criminal prosecution and no basis to conclude that his challenge to subject matter jurisdiction might rise to the level of a federal constitutional violation. The record establishes that at the end of Petitioner's preliminary hearing, the district court advised Petitioner that he would "be bound over to Circuit Court on the charges as they appear in the Felony

30

Information that [was] provided [to] your attorney." (ECF No. 29-2, PageID.726.) Petitioner provides no argument to suggest that he did not receive sufficient notice of the charges and did not have an adequate opportunity to defend himself. Accordingly, because Petitioner cannot demonstrate that the trial court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, he is not entitled to relief with respect to the due process aspect of habeas ground IX.

### 4.        Ground XI—Picture of Juror

As his final habeas ground, Petitioner contends that the trial court violated his due process rights by allowing the investigating officer "to take a picture of a sitting juror during the trial just before final instructions and deliberation." (Am. Pet., ECF No. 19, PageID.77.)

Petitioner raised this claim in his Rule 6.500 motion, and the trial court rejected it, stating:

> The officer took a picture of a juror to show to a person who had called the court indicating that a juror had been in a coffee shop talking about the case. The picture was needed to show to the person to determine which juror it was in order to question them. The defense and prosecution were aware that a call had been received and of what was going to be done. The issue regarding the juror was addressed by the Court of Appeals who found it was proper.
>
> [Petitioner] does not explain how the process used to determine which juror was the one not following the rules so they could be excused somehow violates his due process rights.

(ECF No. 29-19, PageID.2768.)

The record reflects that prior to final jury instructions being given, the parties asked to speak to the trial judge because a reporter had overheard one of the jurors talking about the case at a local coffee shop. (Trial Tr. VII, ECF No. 29-15, PageID.2412.) The trial judge conducted a hearing regarding the matter in chambers. The investigating officer took a picture of the juror to determine which juror was at issue. (*Id.*, PageID.2421.) The trial judge then directed that the juror be brought into chambers to be questioned.

31

Afterwards, when the court resumed trial and right before the judge was poised to give final instructions, one juror asked "what the picture was for." (*Id.*, PageID.2430.) The judge confirmed that the picture was to discern which of the jurors had to be called in for the in-chambers hearing. (*Id.*) The juror asked if the picture was deleted "from [the officer's] cloud and his sim," and the court responded, "I'm sure he will." (*Id.*) The court then said that the picture would be destroyed, and the officer indicated that it had already been done before they entered the courtroom. (*Id.*)

As noted above, the trial court denied Petitioner's claim on the basis that Petitioner had not explained in his Rule 6.500 motion how the process used to identify the juror violated Petitioner's due process rights. Petitioner fails to correct that deficiency in his § 2254 petition. Petitioner simply does not explain, and the Court does not discern, how the officer's taking a photo of the juror violated Petitioner's due process rights in any way. Because Petitioner has not established that the trial court's rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law, Petitioner is not entitled to relief with respect to habeas ground XI.

### D.    Violation of Right to Counsel

In his sixth ground for relief, Petitioner takes issue with the prosecutor's use of testimony "from an incarcerated informant that [Petitioner] allegedly confessed to the crime." (Am. Pet., ECF No. 19, PageID.67.) Petitioner appears to suggest that his right to counsel was violated when these statements were elicited. (*Id.*)

Petitioner raised this claim in his Rule 6.500 motion, and the trial court denied it, stating:

> Here [Petitioner] argues that his right to counsel was violated when his attorney was not present for the questioning of a cellmate by the police regarding statements [Petitioner] made to him admitting to the crime. [Petitioner] argues that his incriminating statements should have been suppressed because Vshaun Brown elicited these statements in the absence of [Petitioner's] attorney after Brown agreed to cooperate with police. This does not match with the evidence that came out at trial. There was no indication that the police had contacted Mr. Brown before

32

the statements were made to get him to solicit the statements. In addition, the jury was instructed on the danger involved in relying [on] such witnesses and to be wary when doing so.

[Petitioner's] argument is without merit that his attorney should have been present in the cell with him when the comments took place or when Mr. Brown spoke to the police regarding them.

(ECF No. 29-19, PageID.2765–2766.)

The Sixth Amendment right to counsel is violated when the state, through government agents, surreptitiously question a criminal defendant in the absence of counsel and those statements are admitted into evidence at trial. *See Maine v. Moulton*, 474 U.S. 159, 176–77 (1985). For example, in *Moulton*, the state recorded conversations between the defendant and the cooperating co-defendant and admitted those statements as evidence at trial. *See id.* The Sixth Amendment, however, does not prohibit the admission of statements made by a defendant to a jailhouse informant who is placed in close proximity to the defendant but makes no overt effort to initiate a conversation regarding the crime with the defendant. *See Kuhlmann v. Wilson*, 477 U.S. 436, 456 (1986). Notably, "[w]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 449 (1966)).

Thus, "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Moulton*, 474 U.S. at 176. Merely arguing that an informant reported incriminating statements to law enforcement does not demonstrate a violation of the Sixth Amendment right to counsel. *See Kuhlmann*, 477 U.S. at 459. Instead, a defendant must show that the police and the informant took some action, beyond listening, deliberately designed to elicit incriminating statements. *See id.*

At trial, Vshaun Brown testified that Petitioner became his cellmate in early September of 2015. (Trial Tr. VI, ECF No. 29-14, PageID.2201–2202.) Brown sent a note to the prosecutor on

November 29, 2015, asking to speak to authorities regarding Petitioner's case. (*Id.*, PageID.2201.) Brown testified that three or four days after he and Petitioner became cellmates, Petitioner started talking to Brown about his case. (*Id.*, PageID.2202.) Brown testified that Petitioner was concerned that gunshot residue had been found on his person after arrest. (*Id.*) Petitioner also told Brown "about the number of times he thought he had shot Eugene Jackson, which [Petitioner said was] three." (*Id.*, PageID.2203.) Petitioner also told Brown about a spot of blood on his hoodie that would test positive as the victim's blood. (*Id.*, PageID.2204.) Petitioner talked to Brown about the type of gun he used, and that he had handed off the gun to someone Petitioner called "Uncle." (*Id.*, PageID.2204–2205.) Petitioner also told Brown that he had washed his hands in the holding cell, before they were tested for gunshot residue. (*Id.*, PageID.2205.) Brown denied talking to anyone about Petitioner's case prior to sending the letter to the prosecutor's office. (*Id.*, PageID.2206.)

Upon review of the record, the Court concludes that Petitioner has failed to show that Vshaun Brown was acting as a government agent when Petitioner made his incriminating statements to Brown. Nor has Petitioner shown that Brown acted with government agents to take action deliberately designed to elicit those statements. Brown's testimony indicates that he and Petitioner had only been cellmates for a few days when Petitioner made his statements, and that Brown reached out to the prosecutor's office a few months after those statements were made. Accordingly, Petitioner's case presents a situation where the State obtained the incriminating statements "by luck or happenstance." *Moulton*, 474 U.S. at 176. As set forth *supra*, obtaining incriminating statements in such a manner after the right to counsel has attached does not violate the Sixth Amendment.

Petitioner has not demonstrated that the trial court's rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief with respect to habeas ground VI.

### E.    Grounds Asserting Prosecutorial Misconduct

In his seventh ground for relief, Petitioner contends that the prosecutor committed misconduct during closing arguments when he argued to the jury "that defense counsel was misleading the jury concerning Officer Mohney's testimony." (Am. Pet., ECF No. 19, PageID.69.) Moreover, as part of habeas ground X, Petitioner asserts that the prosecution committed misconduct by suppressing evidence showing that the victim was shot multiple times in the chest. (*Id.*, PageID.75.)

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court should consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner. *See United States v. Young*, 470 U.S. 1, 11–12 (1985). The Supreme Court has described the *Darden* standard as "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012). The *Parker* Court rejected an attempt to graft any additional requirements on the "very general" *Darden* standard.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487,

512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. 637, 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (internal quotation marks omitted).

### 1.    Closing Arguments

In habeas ground VII, Petitioner contends that the prosecutor committed misconduct during closing arguments when he argued to the jury "that defense counsel was misleading the jury concerning Officer Mohney's testimony." (Am. Pet., ECF No. 19, PageID.69.) Petitioner raised this claim in his Rule 6.500 motion, and the trial court rejected it, stating:

> The [p]rosecutor made a statement about counsels' arguments in closing. Defense counsel objected and the Court instructed the jury that the attorneys' comments are not evidence and told them to only follow the evidence that came from the witness stand. It is improper for a prosecutor to say that defense counsel is intentionally misleading the jury because that type of argument effectively states that defense counsel does not believe [his] own client. *People v. Unger*, 278 Mich. App. 210. [Petitioner] also asserts that the prosecutor in his questioning of the officer regarding whether he found any other leads to other suspects objectionable because they were only proves the point that the answers the witness gives are the evidence not the questions and the jury is presumed to follow their instructions.
>
> The one-time objectionable characterizing of defense counsel was addressed and the other questions were not objected to at the time, defense counsel cross[-]examined the witnesses also. I do not see where these limited instances meet the standard of error which [is] needed to overturn the verdict.

(ECF No. 29-19, PageID.2766.)

The record reflects that the following exchange occurred during the prosecutor's rebuttal argument:

Ms. Davis misrepresented what Officer Mohney testified to when he talked about suspects in this case. It[']s investigators['] jobs to investigate tips and leads. He testified that yes, he investigated all of them. And through that investigation, not a single other suspect was able to be determined other than Westly George.

MS. DAVIS: Your Honor, I would object to him saying that I misled. I don't recall stating anything about Detective Mohney and the suspect issue that he is referring to.

THE COURT: Okay. The jurors will remember the testimony. Again . . .

MS. DAVIS: Thank you.

THE COURT: . . . the statements of the attorneys are not evidence. The evidence is what came from the witness stand.

(Trial Tr. VII, ECF No. 29-15, PageID.2522.)

Upon review of the record, the Court concludes that Petitioner has failed to demonstrate that this statement by the prosecutor induced the jury "to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18–19. Moreover, as the trial court noted, the jury was instructed to consider only the evidence admitted during trial, and that counsel's closing arguments did not constitute evidence. A jury is presumed to follow its instructions. *See Weeks*, 528 U.S. at 234. Petitioner has not demonstrated that this sstatement by the prosecutor during rebuttal argument "so infected the trial with unfairness" that Petitioner was denied due process.

In sum, Petitioner has not demonstrated that the trial court's rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to habeas ground VII.

### 2.    Suppression of Evidence

As part of habeas ground X, Petitioner suggests that the prosecutor committed misconduct by suppressing evidence that the victim was shot multiple times in the chest. (Am. Pet., ECF No. 19, PageID.75.) Petitioner suggests that this evidence is "newly discovered" and that the medical

examiner, Elizabeth Douglas, testified falsely that the victim was shot in the back. (*Id.*) The Court considers Petitioner's claim regarding prosecutorial misconduct below, and considers his "newly discovered evidence" claim *infra* in Part III.G.

Petitioner has attached a copy of the death certificate to his amended § 2254 petition. (ECF No. 19-1, PageID.218.) The death certificate does state that the victim died from "[m]ultiple gunshot wounds to chest." (*Id.*) During trial, Dr. Elizabeth Douglas testified that during the autopsy, she was able to determine that the victim was shot four times: "in the right lower back, kind of the left lower back, the left forearm, and the left leg." (Trial Tr. V, ECF No. 29-13, PageID.2096.) Dr. Douglas testified that the shot to the right lower back inflicted the lethal injuries because it caused perforations of the lung and left "quite a bit of blood within the left—or I'm sorry—the right chest cavity." (*Id.*) Dr. Douglas indicated that the lethal shot left an exit wound on the victim's chest. (*Id.*, PageID.2100.) She also noted that it was a perforating wound, meaning no bullet fragments were left in the body. (*Id.*, PageID.2101.)

Petitioner's prosecutorial misconduct claim implicates *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. There are three components to finding a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Prejudice (and materiality) is established by a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280

(quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469–70 (2009). A reasonable probability equates to a "probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

> Petitioner raised this claim in his Rule 6.500 motion, and the trial court rejected it, stating:

> [Petitioner] asserts that the "new evidence" was just obtained last fall and is the death certificate of the decedent. [Petitioner] argues that the testimony of the medical examiner was perjured because she said he was shot in the back and the death certificate states cause of death was "multiple gun shot wounds to chest" and that this must mean he was shot in the front. What [Petitioner] did not share is that the death certificate was signed by Dr. John Robertson not Dr. Elizabeth Douglas who conducted the autopsy and who testified. It is clear that the decedent was shot multiple times in the chest and the Dr. that conducted the autopsy testified that the bullets entered the chest from the back. There was no perjury.

> . . .

> The prosecutor did not "suppress" the death certificate. It is a public record. It was not favorable to the defense and kept from them. It states just what the medical examiner testified to. The decedent died from gun shot wounds to the chest. The medical examiner provided more detail as to where the entry was made, the damage done to the organs in the chest and the cause of death from those injuries.

(ECF No. 29-19, PageID.2768.)

Petitioner offers nothing to indicate that the trial court strayed from clearly established federal law in rejecting this assertion of prosecutorial misconduct. Accepting the trial court's determination as correct, Petitioner cannot show that the prosecution violated *Brady* in any way. The death certificate was a public record and, therefore, was not suppressed by the prosecution. Moreover, nothing in the death certificate is favorable or exculpatory to Petitioner's defense. Dr. Douglas provided more context regarding the decedent's death at trial. As explained *supra*, the gunshot wounds entered the victim from the back and left exit wounds on the front of his body, including his chest.

The trial court's rejection of this claim of prosecutorial misconduct was not contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to the prosecutorial misconduct aspect of habeas ground X.

### F.    Grounds Asserting Ineffective Assistance of Counsel

In his second ground for relief, Petitioner contends that trial counsel was ineffective for "fail[ing] to request an instruction to support a lesser[-]included offense of voluntary manslaughter." (Am. Pet., ECF No. 19, PageID.80.) In ground IV, Petitioner avers that counsel was ineffective for not moving to suppress evidence obtained from Petitioner's person "pursuant to a search warrant, because the affidavit submitted in support of the search warrant for his person contained knowingly false statements that were necessary to establish probable cause to issue the warrant." (*Id.*, PageID.71.) Finally, as part of his fifth ground for relief, Petitioner suggests that counsel was ineffective for not challenging the trial court's jurisdiction over Petitioner and for not entering a plea to the charges on Petitioner's behalf. (*Id.*, PageID.73.)

### 1.    Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the [Petitioner] resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The [Petitioner] bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic

decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the [Petitioner] is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential", per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Furthermore, scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised his second ground for relief on direct appeal and asserted his other ineffective assistance claims in his Rule 6.500 motion. On direct appeal, the Michigan Court of Appeals explicitly cited *Strickland* for the standard. *See George*, 2018 WL 3244122, at *4. In its order denying Petitioner's Rule 6.500 motion, the trial court did not set out a standard under which it addressed Petitioner's ineffective assistance claims.

There is no question that the court of appeals applied the correct standard on direct appeal, and Petitioner offers nothing to suggest that the trial court applied an incorrect standard when reviewing his Rule 6.500 motion. This eliminates the possibility that the resulting decisions are "contrary to" clearly established federal law. Therefore, because the state courts applied the correct standard, Petitioner can only overcome the deference afforded state court decisions if the determinations regarding ineffective assistance of counsel are unreasonable applications of *Strickland* or if the state courts' resolutions were based on unreasonable determinations of the facts. *See* 28 U.S.C. § 2254(d).

**2.      Ground II—Lesser-Included Instruction**

Petitioner first faults counsel for failing to request a lesser-included jury instruction for voluntary manslaughter. (Am. Pet., ECF No. 1, PageID.80.)

Petitioner raised this claim on direct appeal, arguing that such an instruction was warranted because "there was virtually no evidence presented as to premeditation." *George*, 2018 WL 3244122, at *4. The court of appeals disagreed, first noting that a voluntary manslaughter conviction required a killing "in the heat of passion" caused by "adequate provocation." *Id.* (quoting *People v. Mendoza*, 468 Mich. 527, 541; 664 N.W.2d 685 (2003)). The court of appeals then stated:

> There was no evidence on the record of adequate or contemporaneous provocation to support an instruction of voluntary manslaughter. There was testimony given by various witnesses that place the victim and [Petitioner] together shortly before the shooting and none of these witnesses testified that it appeared that there were any issues or problems between [Petitioner] and the victim at that time. By contrast there was evidence of premeditation presented when five days prior to the shooting [Petitioner] told the victim's mother that he was going to shoot her son. Furthermore, the focus of trial counsel's defense argument was that someone else was the shooter. Based on this theory of defense it would appear that trial counsel's failure to request a voluntary manslaughter instruction was a matter of trial strategy. "Failing to request a particular jury instruction can be a matter of trial strategy." *People v. Dunigan*, 299 Mich. App. 579, 584; 831 N.W.2d 243 (2013). This Court will not substitute its judgment for that of counsel regarding matters of trial

42

strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v. Garza*, 246 Mich. App. 251, 255; 631 N.W.2d 764 (2001).

*George*, 2018 WL 3244122, at *4.

Given the double deference owed to the court of appeals' conclusion, it is not for this Court to decide whether counsel's strategy was reasonable. Rather, this Court must determine "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. The Court, therefore, must consider the court of appeals' assessment of trial counsel's action, not counsel's action itself.[5]

In *Keeble v. United States*, 412 U.S. 205 (1973), the Supreme Court explored the possible outcomes that might follow from giving—or failing to give—a lesser-included offense instruction. The *Keeble* Court acknowledged the potential benefit that Petitioner claims was denied to him at trial:

> [I]t is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction. In the case before us, for example, an intent to commit serious bodily injury is a necessary element of the crime with which petitioner was charged, but not of the crime of simple assault. Since the nature of petitioner's intent was very much in dispute at trial, the jury could rationally have convicted him of simple assault if that option had been presented. But the jury was presented with only two options: convicting the defendant of assault with intent to commit great bodily injury, or acquitting him outright. We cannot say that the availability

---

[5] Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy and, therefore, can only prevail if he shows that the challenged action **cannot** be considered sound trial strategy. Thus, as the *Harrington* Court noted, "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at 110. If the Michigan Court of Appeals conceived of a sound strategy that includes the challenged action, the matter is resolved.

of a third option—convicting the defendant of simple assault—could not have resulted in a different verdict.

*Keeble*, 412 U.S. at 212–13; *see also Beck v. Alabama*, 447 U.S. 625, 634 (1980) (noting that "providing the jury with the 'third option' of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard").

The Sixth Circuit has considered similar claims from habeas petitioners in numerous opinions. For example, the Sixth Circuit has held that counsel was not ineffective for failing to request a lesser-included manslaughter instruction in a situation where the petitioner and defense counsel's primary defense theory was that the petitioner was not the one who shot the victim. *See Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir. 2005). The Sixth Circuit has also declined to find ineffective assistance of counsel where counsel's failure to request a lesser-included voluntary manslaughter instruction was consistent with the defendant's effort to seek a full acquittal on the basis of self-defense. *See Lewis v. Russell*, 42 F. App'x 809, 810–11 (6th Cir. 2002). Similarly, in *Edwards v. Mack*, the Sixth Circuit concluded that counsel was not ineffective for waiving jury instructions for lesser-included offenses where counsel and the defendant hoped to obtain an acquittal on the murder charge. *See Edwards v. Mack*, 4 F. App'x 215, 217–18 (6th Cir. 2001). Overall, the Sixth Circuit has concluded that such a "high risk, high reward" strategy is reasonable when there is sufficient evidence in the record to support a chance of acquittal. *See Kelly v. Lazaroff*, 846 F.3d 819, 830 (6th Cir. 2017); *see also Harrop v. Sheets*, 430 F. App'x 500, 507 (6th Cir. 2011) (discussing that counsel could have reasonably decided not to request a lesser offense instruction because such an instruction "would have diluted the other arguments [counsel] was advancing to the jury").

Here, the record before the Court establishes that defense counsel's strategy was to argue that Petitioner was not the shooter, thereby hoping for a full acquittal. In sum, Petitioner's situation

is quite similar to those presented in *Tinsley*, *Edwards*, *Kelly*, and *Harrop*, where the Sixth Circuit

concluded that counsel was not ineffective for not requesting lesser-included instructions because

the defendant hoped to obtain a complete acquittal. Petitioner has failed to show that the court of

appeals' rejection of this claim of ineffective assistance was contrary to, or an unreasonable

application of, *Strickland*. Accordingly, Petitioner is not entitled to relief with respect to habeas

ground II.

### 3.    Failure to Seek Suppression of Evidence

As his eighth ground for relief, Petitioner suggests that counsel was ineffective "for failing

to move to suppress evidence obtained from [Petitioner's] person pursuant to a search warrant,

because the affidavit submitted in support of the search warrant for his person contained knowingly

false statements that were necessary to establish probable cause to issue the warrant." (Am. Pet.,

ECF No. 19, PageID.71.)

Petitioner relies upon his Rule 6.500 brief to provide context for his claim. In that brief,

Petitioner argued that the affidavits supporting the search warrants for the premises as well as for

Petitioner's person contained false statements. (ECF No. 19-1, PageID.147.) Specifically,

Petitioner states:

> [Petitioner] argues that the search warrant affidavit falsely reported that Sergeant
> Howes interviewed Angelo Brown on the scene who stated that Westly Lacharles
> George III had shot Eugene, and fled from the scene; that Angelo Brown advised
> Sergeant Howes that Westly shot Eugene with a matt[e] (dull) gray/black in color
> revolver; that officers upon arrival discovered that Eugene D'Mario Jackson had
> been shot and transported by ambulance to Three Rivers Hospital; that Westly had
> blood on his shirt.

(*Id.*, PageID.149.) Petitioner suggests that if these false statements are set aside, the affidavits

attached to the warrants do not contain sufficient information to support a finding of probable

cause. (*Id.*)

Petitioner raised this claim in his Rule 6.500 motion, and the trial court rejected it, stating:

There was no motion to suppress the evidence obtained pursuant to the search warrants in this case. The basis for the claim is that witnesses testified differently as to how certain things occurred at the preliminary exam and at trial than what the officers were told at the time of the warrants being sought. This is not the basis to find that the officers intentionally falsified information to obtain [Petitioner's] closed and other evidence which showed the presence of gunshot residue.

There was no basis for council to raise a motion to suppress a warrant until the witnesses testified at trial after the evidence was already introduced. There is no basis to conclude that the officers submitted false affidavits because witnesses testify differently later.

(ECF No. 29-19, PageID.2767.)

The Supreme Court has noted that "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *see also Richardson v. Palmer*, 941 F.3d 838, 857 (6th Cir. 2019). Accordingly, Petitioner's ineffective assistance claim requires consideration of the merits of Petitioner's Fourth Amendment claim and, to the extent that Petitioner's Fourth Amendment claim lacks merit, his ineffective assistance claim necessarily fails.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment requires "only three things" with respect to search warrants. *Dalia v. United States*, 441 U.S. 238, 255 (1979). First, the warrant must be issued by a "neutral and detached" magistrate "capable of determining whether probable cause exists." *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972). Second, there must be a finding of probable cause. *See* U.S.

Const. amend. IV. Third, the search warrant must "particularly describe[e] the place to be searched, and the . . . things to be seized." *Id.*; *see also Maryland v. Garrison*, 480 U.S. 79, 84–85 (1987).

A defendant may be entitled to have a warrant voided when the warrant affiant's statements were deliberately false or made in reckless disregard for the truth and the affidavit's remaining content is insufficient to establish probable cause. *Franks v. Delaware*, 438 U.S. 154, 156 (1978). The burden rests on the defendant to establish by a preponderance of the evidence that the affidavit contains a reckless or deliberate falsehood and that with this material "set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Id.*

As noted above, the trial court rejected Petitioner's assertion of ineffective assistance because Petitioner had not demonstrated that the officers deliberately submitted false affidavits in support of the search warrants. Petitioner has not corrected that deficiency in his § 2254 petition. Instead, Petitioner relies upon his Rule 6.500 brief, in which he argued that the affidavit falsely stated that the victim had been transported to the hospital by ambulance. (ECF No. 19-1, PageID.152.) Petitioner claims this statement was false because a witness testified at the preliminary examination that he had picked up the victim's body and drove him to the hospital. (*Id.*) Petitioner also suggests that the affidavit falsely stated that Angelo Brown had seen Petitioner with a gun because Brown testified at the preliminary examination and trial that he had not seen Petitioner with a gun on the evening in question. (*Id.*, PageID.154–156.) Petitioner argues that these false statements were necessary for the probable cause determination. (*Id.*, PageID.156.)

Petitioner does not explain, and the Court does not discern, how the manner in which the victim was transported to the hospital was material to a determination of probable cause. Furthermore, even if the affidavit in support of the search warrant omitted the statement that Angelo Brown had told officers that Petitioner shot the victim with a matte gray/black revolver,

the affidavit's remaining content is still sufficient to establish probable cause. When officers

arrived on scene, they found that the victim had been shot, and Brown told them that Petitioner

had been the one to shoot the victim. (ECF No. 19-1, PageID.227–228.) The officer who located

Petitioner "immediately observed" blood on the right cuff of Petitioner's shirt, and noticed that

Petitioner was not injured. (*Id.*) Ray Merryman and Herbert Drayton told officers that Petitioner

had come to their residence about 15 minutes prior to the shooting and stayed for about 5-6

minutes. (*Id.*) A short time after the shooting, Petitioner ran through the residence. (*Id.*) Merryman

saw Petitioner standing near the back door, and Petitioner stated, "I'm scared." (*Id.*) These

allegations, taken as a whole, were sufficient to establish probable cause for the search of the

premises as well as Petitioner's person.

Even if Angelo Brown mistakenly told officers that Petitioner had shot the victim with a

revolver, Petitioner has not demonstrated that the officer who was the affiant for the warrant know

that the statement was false or included it in reckless disregard for the truth of the statement. *See*

*Franks*, 438 U.S. at 156. Simply put, the challenge that Petitioner claims his counsel failed to raise

was meritless, and "[o]mitting meritless arguments is neither professionally unreasonable nor

prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *see also Mahdi v. Bagley*, 522

F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim.").

Accordingly, Petitioner is not entitled to relief with respect to habeas ground VIII.

### 4.     Failure to Challenge Subject-Matter Jurisdiction

As part of habeas ground IX, Petitioner suggests that counsel was ineffective for failing to

challenge the trial court's subject-matter jurisdiction over Petitioner. (Am. Pet., ECF No. 19,

PageID.73.) Petitioner also appears to fault counsel for not ensuring that such jurisdiction was

established by entering a plea on Petitioner's behalf. (*Id.*) As discussed *supra*, Petitioner's subject-

matter jurisdiction argument is wholly without merit, and it would have been futile for counsel to

argue otherwise. *See Coley*, 706 F.3d at 752; *Mahdi*, 522 F.3d at 638. Accordingly, Petitioner is not entitled to relief with respect to this portion of habeas ground IX.

### G.  Ground VI—Newly Discovered Evidence

As part of his sixth ground for relief, Petitioner contends that "newly discovered evidence" shows that the medical examiner, Elizabeth Douglas, "testified falsely regarding her examination of [the] decedent." (Am. Pet., ECF No. 19, PageID.75.) According to Petitioner, this new evidence shows that the victim was shot multiple times in the chest, but Douglas testified that he was shot in the back. (*Id.*) Petitioner appears to suggest that he is entitled to a new trial and/or is actually innocent based upon this newly discovered evidence.

Any claim of actual innocence, however, fails to state a cognizable federal claim. The Supreme Court has held that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera*, 506 U.S. at 400. But the *Herrera* Court did not close the door completely, stating in dicta: "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id.* The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House v. Bell*, 547 U.S. 518, 555 (2006) ("In *Herrera*, however, the Court described the threshold for any hypothetical

freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007).

Two years after *Herrera,* the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray*, 477 U.S. at 496. In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a procedural innocence claim, which can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive or "free-standing" claim of innocence discussed in *Herrera*.

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412. In the absence of clearly established Supreme Court precedent establishing a free-standing claim of actual innocence, Petitioner's claim is without merit. The Sixth Circuit repeatedly has held that free-standing claims of actual innocence are not cognizable on habeas corpus review. *See Smith v. Nagy*, 962 F.3d 192, 206 (6th Cir. 2020) (citing *Schlup* and *Herrera*); *Cress*, 484 F.3d at 854 (citing cases). Even if Petitioner could invoke this exception and

obtain habeas relief on his freestanding innocence claim, he would have to meet both of the requirements set forth above and then overcome the "extraordinarily high" threshold. Petitioner fails the first requirement. This is not a capital case, and thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *See Herrera*, 506 U.S. at 417 ("We first point out the obvious - that this is not, in fact, a capital case."). Accordingly, Petitioner cannot obtain habeas corpus relief on any freestanding claims of actual innocence, and he is not entitled to habeas relief with respect to this portion of habeas ground X.

## IV.   **Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of

Petitioner's claims. *Id.*

      The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## <u>Conclusion</u>

      The Court will enter an order and judgment denying the § 2254 petition as well as a certificate of appealability.

Dated:    <u>August 12, 2024</u>             <u>/s/ Paul L. Maloney</u>
                                                Paul L. Maloney
                                                United States District Judge